THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. LIONEL A. GRECO, DEFENDANT-APPELLANT.

Argued November 18, 1958—Decided February 2, 1959.

*Mr. Maurice C. Brigadier* argued the cause for appellant.

*Mr. Leo Kaplowitz,* Assistant Prosecutor, argued the cause for the State (*Mr. H. Douglas Stine,* Union County Prosecutor, attorney).

The opinion of the court was delivered by

WACHENFELD, J.   The defendant, a licensed physician and surgeon of the State of New Jersey, was convicted in the Union County Court on 29 counts of an indictment charging him with obtaining money by false pretenses from the Medical-Surgical Plan of New Jersey, familiarly known as Blue Shield. He addressed an appeal to the Appellate Division which we certified on our own motion.

From about 1942 until 1957 defendant was employed by the County of Union at the John E. Runnells Hospital for Chest Diseases, a county institution.   At all times herein relevant his position was classified as "Resident Surgeon." He specialized in the surgical treatment of chest ailments, although he was frequently required to perform medical and surgical services unrelated to his specialty.   As part of his duties he resided on the hospital premises.   He also maintained a private office in Newark.

In 1949 Dr. Greco became formally affiliated with the Medical-Surgical Plan of New Jersey as a participating physician.   He signed a standard form contract which in part provided:

"I will perform the medical and surgical services specified in the subscription certificates issued or that may be issued by the Plan, in accordance with accepted practices in the community at the time the services are rendered and at such rates of compensation as shall be determined by the Board of Trustees of the Plan. *I will abide by the By-Laws, Rules and Regulations of the Plan applicable to Participating Physicians,* copy [*sic*] of which shall at all times be available in the office of the Plan." (Emphasis supplied)

The by-laws and regulations of the Plan in force at the time Dr. Greco became a participating physician were contained in a manual customarily issued by the Plan to each newly affiliated doctor. Article XI of the by-laws, entitled "Participating Physicians," specifies:

"Participating Physicians may be any physicians (*other than hospital Resident Physicians and/or Internes*) fully licensed to practice medicine and surgery in the State of New Jersey * * *." (Emphasis supplied)

This definition is substantially reiterated in the accompanying Code of Regulations, which in addition provides, under the heading "Services NOT Eligible":

"The Plan shall not be liable, nor shall services be deemed eligible for payment under the Contract:
4. If the services are those of a *surgical assistant or of a hospital resident physician or intern,* or are rendered by a physician practicing under a limited license, or by a dentist or other person who is not an Eligible Physician as defined in the Contract." (Emphasis supplied)

During the years 1953 through 1956 defendant submitted to the Plan 29 applications for payment for surgical services rendered to county patients in the county hospital. None of these persons were Dr. Greco's private patients. All of the applications were honored by the Plan, which paid the defendant at its stipulated rates. These applications and payments are the subjects of the present criminal proceeding.

Two indictments, 374 and 375, were returned against defendant by the Union County grand jury and tried jointly in the court below. Indictment No. 375 was dismissed at the close of the State's case in chief. It charged that Dr.

Greco had unlawfully used his appointive position with the county for the promotion and furtherance of a scheme to mulct the Medical-Surgical Plan, "contrary to the provisions of *R. S.* 30:9–66 and *N. J. S.* 2A:111–14."

*R. S.* 30:9–66 is a non-criminal statute regulating the relationship between county hospitals and their patients. In part it provides that no officer or employee of such a hospital shall accept from a patient any fee or gratuity for services rendered. *N. J. S.* 2A:111–14 makes it a misdemeanor to use a corporation for fraudulent purposes.

Indictment No. 375 was dismissed upon the grounds that *R. S.* 30:9–66 does not contain a penal sanction and that no evidence had been produced to show that defendant had violated *N. J. S.* 2A:111–14 by using the county, a public corporate body, as a shield for his allegedly fraudulent activities. The trial court was also of the opinion that the latter statute did not apply in the situation *sub judice* but only to corporate officers who fraudulently abuse the corporate veil.

Defendant was convicted upon indictment No. 374. Each count of that indictment is identical save for the recitation of dates, monetary amounts, and the various patients' names. The gravamen of the offenses charged is that Dr. Greco, "intending to cheat and defraud the Medical-Surgical Plan of New Jersey * * * did then and there unlawfully, knowingly and designedly falsely represent and pretend * * * that he, the said Lionel A. Greco, was lawfully and properly an eligible and participating physician * * * and entitled to receive payments from the said Medical-Surgical Plan of New Jersey for professional services allegedly rendered * * *" to the 29 county patients named.

*N. J. S.* 2A:111–1 demands that the false pretense which criminally procures the payment of moneys be made "knowingly or designedly, with intent to cheat or defraud." Under the statute a fraudulent intent is necessary to ripen a mere misrepresentation into a criminal act. *Sharp v. State,* 53 *N. J. L.* 511 (*Sup. Ct.* 1891); 35 *C. J. S. False Pretenses* § 23; 22 *Am. Jur., False Pretenses,* § 23.

Recognizing the burden of its obligation to prove the existence of a *mens rea,* the prosecution proceeded upon the theory that the defendant had applied for payments for services rendered to Plan subscribers, in his capacity as a regular member of the county hospital staff, while full well knowing that such services were ineligible under the Plan's rules and regulations. It contended that because Dr. Greco was employed by the county on a salary basis he was a "resident physician" of the John E. Runnells Hospital and thus had no right to claim or accept moneys from the Plan as he did. The State's brief declares: "* * * The serious wrongdoing was not the entering into of a contract with the Plan as a participating physician, but rather to then surreptitiously exploit his official position thereby illicitly gaining compensation for which there was no legal justification to receive the same."

It is not disputed that as chief surgeon of the hospital defendant performed all of the medical services referred to in the various counts of the indictment, and that after operating upon each patient he submitted to the Plan a document entitled "Medical-Surgical Plan Service Report," signed by the patient-subscriber and himself and describing the services performed and the amount due defendant for their rendition.

These documents were received in the mail at the Plan's office in Newark and listed Dr. Greco's address as 296 Roseville Avenue, Newark. This was the location of his private office which he had maintained since 1942. The Plan's checks for the amounts claimed were sent to the same address and received there by Dr. Greco.

The principal grounds for reversal asserted by the defendant are that the State utterly failed in its attempt to show *scienter* and that venue was improperly placed in Union County instead of Essex County. Other reasons are urged which need not be dealt with specifically in view of the disposition we make.

In denying defendant's motions for judgment of acquittal on the ground of insufficient proof of criminal intent, the

trial judge acknowledged that Dr. Greco had not been personally notified of the Plan's definition of "resident physician," but concluded that defendant might be presumed to have been cognizant of it because the record would indicate such definition was generally accepted by the medical profession. In the trial court's opinion, there was a genuine conflict of testimony concerning the proper interpretation of the phrase, which "raises an issue of fact for the jury." We think, however, that the evidence presented by the State was wholly inadequate to create a jury question as to the existence or absence of a criminal intent.

Principally through the testimony of Dr. Nicholas F. Alfano, executive vice-president and medical director of the Medical-Surgical Plan, the State attempted to prove defendant had performed the 29 operations in issue as a "hospital resident physician" and that by virtue of his position at the hospital and his familiarity with the rules of the Plan he knew that this status invalidated his claims for payment.

On direct examination, Dr. Alfano testified the phrase " 'resident physician' means a physician under contract with, or employed by a hospital for salary provided by that hospital." He was thereupon asked whether the definition he had given was in accordance with an "accepted practice or plan in the community." After several exchanges, the witness admitted the Plan's definition of "resident physician" differed from the definition common in the practice of medicine throughout the State of New Jersey, although he subsequently retreated from this position.

An extensive cross-examination further impaired the weight and significance of Dr. Alfano's testimony as it reflected upon the issue of *scienter*. He conceded the medical profession as a whole did not "have a clear cut definition of the term 'resident' * * * [i]t differs in so many situations." Defense counsel produced several authoritative medical treatises and a publication by the American Medical Association which described a "residency" as entailing advanced training in preparation for entry upon either a specialty or a general practice with a special em-

phasis. Dr. Alfano admitted his definition did not comport with these texts and that the bald words "resident physician" usually carried the connotation of trainee status. When queried as to whether he had defined the meaning of the phrase in terms of his personal opinion or of the general opinion of the medical profession of the State, he replied:

"It is the view of the, it is the policy of the Board, policy of the Board of Trustees of the Medical-Surgical Plan."

No evidence was offered that the Plan's interpretation of "resident physician," as vouchsafed by Dr. Alfano, could be found in writing, either at the office of the Plan or anywhere in its literature. The doctor hazarded the guess that medical dictionaries and the *New Jersey Medical Directory* would support his views, but he admitted he had not previously consulted either in this regard. Defendant promptly confronted Dr. Alfano with a medical dictionary which did not define "resident physician" as such, but did contain the following definition of "Interne":

"A resident physician or surgeon in a hospital."

The defense, on its case, produced the unimpeached testimony of three New Jersey physicians who categorically refuted the State's interpretation of the phrase "resident physician." One of its doctors testified:

"A resident physician is a physician in training, who trains to acquire more specific knowledge in a specific field so that he may later on, possibly practice in this field, with the special knowledge."

Another agreed that:

"Residencies act as a stepping stone to specialization or to general practice with special emphasis."

The defendant himself took the stand and denied any impropriety in collecting the fees in question from the Plan. He stated he had not read the contract he had signed upon joining the Plan in 1949, since he was then under the im-

pression that he was already a participating physician, as of some previous time, by virtue of a conversation he had had with a Dr. Scott, a former officer of the Plan. He also said he had resided at the hospital for the institution's convenience and had made applications for payment of the fees in question because he believed himself to be a participating physician who was fully entitled to them.

· In actuality, there is no evidence nor is it contended that anyone ever informed Dr. Greco of the Plan's interpretation of the phrase "resident physician." If the meaning or connotation attributed to it by the State were universal or even generally accepted by New Jersey practitioners of medicine, it might perhaps be properly inferred that defendant was aware of it and, consequently, knew that the services he had rendered were ineligible for payment. But the record *sub judice* is quite to the contrary. It evinces a mass of confusion which sufficiently persuades the disinterested reader that even in the medical field divergent and conflicting definitions are commonplace. In fact, on the basis of the evidence adduced it can be said the phrase probably refers primarily to a supervised apprenticeship in an approved hospital for the purpose of receiving advanced training in a special field, similar, in the training aspect, to an interneship. The wording of the Code of Regulations of the Plan, associating in the same clause "surgical assistant," "hospital resident physician" and "intern," might seem in and of itself to be intended to exclude services rendered by fledgling or trainee doctors but not those performed by fully qualified hospital staff physicians.

From the record before us, we conclude the State's case lacked sufficient proof that the adverse connotation of "resident physician" was known to defendant and that he was willfully and fraudulently acting contrary to its dictates in seeking the disputed payments from the Plan. Dr. Greco was not in any sense a trainee but was a completely accredited and qualified surgeon.

Under the guise of "rebuttal" evidence, the State offered additional medical testimony to support its definition

of "resident physician." Proof of the meaning of this phrase was part and parcel of the State's main case, however, and the evidence in question was not needed to meet any unexpected developments brought about by the defense presentation. We are inclined to think it was an abuse of discretion to admit such additional testimony, intended to meet the State's primary burden, after the defense had rested. But it is unnecessary to decide this question for even giving full weight to the so-called "rebuttal" testimony, it does not add enough to the record to overcome the deficiencies already enumerated.

Our ultimate conclusion is based upon the firm doctrine of our criminal law that it must be shown that a defendant knew of the falsity of his representations before he can be convicted of the crime of obtaining money by false pretenses. As the Appellate Division said on this issue of *scienter* in *State v. Samurine*, 47 *N. J. Super.* 172, 183 (*App. Div.* 1957), reversed *per curiam* on other grounds, 27 *N. J.* 322 (1958):

"* * * Falsity, in the sense of *N. J. S.* 2A:111–1, must be subjective as well as objective; the statement must not only be false in fact but false to the knowledge of its utterer. The burden of proving guilty knowledge is on the prosecution, and failure of the State to prove the existence of this element compels acquittal even though a misrepresentation may in fact have been made. *Sharp v. State*, 53 *N. J. L.* 511 (*Sup. Ct.* 1891)."

For the reason expressed, the judgment of conviction is reversed and the cause is remanded.

One further contention remains to be considered, however. Defendant argues that the false pretenses, if any, occurred in Essex County and that he was entitled to judgment in his favor on the ground that venue had been improperly laid in Union County. This query should be answered since it may be encountered if there is a retrial.

The State insists the evidence justifies a finding that the subscribers' portions of the applications for payment were executed by the various patients, under the defendant's instructions, in Union County and urges that despite the

fact the alleged false pretenses were made to the Medical-Surgical Plan in Essex County and the checks to the defendant were issued and mailed there, still those incidents of the crime which occurred in Union County were sufficient to support the prosecution. It contends, additionally, that the situation falls within *R. R.* 3:6–1(*b*), which provides:

"Where it is uncertain in which one of two or more counties the criminal offense has been committed, prosecution may be had in any of such counties."

The basic inquiry is whether or not venue is jurisdictional. In *State v. O'Shea,* 28 *N. J. Super.* 374 (*App. Div.* 1953), affirmed 16 *N. J.* 1 (1954), it was held that venue, though it must be proved by the State, is not an element of the crime. The court there, in disposing of the issue raised, said:

"In our State, where indictments are returnable in the Superior Court, *R. R.* 3:3–8, jurisdiction and venue are to be distinguished. Venue in the Superior Court relates to that territorial area within the State, where the case is to be prosecuted. So regarded, a question as to venue in the Superior Court is a mere matter of practice and procedure. * * *" (*page* 379)

The authorities generally support the tendency of the law, at least in those jurisdictions unfettered by constitutional or statutory limitations, not to allow technical questions of venue to be made a refuge for the guilty. *Blume, "The Place of Trial of Criminal Cases,"* 43 *Mich. L. Rev.* 59 (1944). Proper and orderly practice, of course, requires that the prosecution be maintained in the county where the offense was committed. But in New Jersey, although the County Courts' original jurisdiction is only county-wide, those courts take cognizance of criminal indictments by assignment from the Superior Court. *R. R.* 3:4–1.

Another aspect of the situation must be given consideration. *R. R.* 3:5–5(*b*)(2) provides:

"Defenses and objections based on defects in the institution of the prosecution or in the indictment or accusation other than that it

fails to show jurisdiction in the court or to charge an offense must be raised by motion before trial. The motion shall include all such defenses and objections then available to the defendant. Failure so to present any such defense or objection constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver. ✳ ✳ ✳"

In the present case there is nothing which suggests the practice set forth in *R. R.* 3:5–5(*b*)(2) could not have been complied with. The defendant, however, waited to make his motion respecting venue until after the completion of the State's case. His objection was untimely and, therefore, rightfully denied.

The counties involved are neighboring counties, and there has been no charge or claim by the defendant of prejudice or embarrassment in obtaining the attendance of all of his witnesses or the presentation of his complete case. He was not hindered or impeded in any aspect of his defense, and his full day in court was not limited in any way by the location of the forum where the trial was conducted.

Under the circumstances *sub judice,* we think the court below proceeded properly on the issue of venue.

Reversed and remanded.

PROCTOR, J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For affirmance*—Justice HEHER—1.