113 N.J. Super. 11 (1971)
272 A.2d 544
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIAM A. SCHULTHEIS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 1970.
Decided January 13, 1971.
*12 Before Judges GOLDMANN, LEONARD and MOUNTAIN.
*13 Mr. Angelo P. Mone argued the cause for appellant.
Mr. Leonard N. Arnold, Assistant Prosecutor, argued the cause for respondent (Mr. Michael R. Imbriani, Somerset County Prosecutor, attorney).
The opinion of the court was delivered by LEONARD, J.A.D.
Defendant William Schultheis appeals from convictions of unlawful possession of a weapon (N.J.S.A. 2A:151-41), threatening to take the life of another (N.J.S.A. 2A:113-8) and bookmaking (N.J.S.A. 2A:112-3). He was jointly tried to a jury with one Louis Turi who was also convicted of threatening to take life, bookmaking and in addition, with breaking and entering with intent to assault (N.J.S.A. 2A:94-1).
Edward Preston testified that on September 29, 1968 he, then 15, lived at home with his father, Andrew, in Bound Brook, N.J. That evening at or about 8 o'clock, he and a friend, Louis Delatorca, were alone in the family house watching television when he heard a knock on the back door followed by one at the front door. He opened the front door but not the screen door, and present was a man, later identified as defendant, who said he was an insurance agent looking for his [Edward's] father. Defendant was admitted and he, immediately, pushed Edward back into the hallway and reached for a holster just above his waist and put his hand on a gun. Edward was very scared and obeyed the man's command to get back into the living room. At this point he saw another person in the kitchen who had come in through the back way. His face was covered by something that looked like a nylon stocking which blurred his features.
Defendant then shoved Edward into the hall and directed him to phone his father. He did and told him that there were a couple of gentlemen in the house who wished to talk to him. He gave the phone to defendant who, before *14 talking to the father, made Edward lie face down on the floor. The other man also took the phone and spoke to his father. The phone was given to Edward on two occasions and he conversed with his father each time, the last time for a couple of minutes. Shortly thereafter the police came to the front door and defendant and the other man fled through the back door.
Edward further testified that defendant threatened him and his friend: "He would take us to the river, take us to Newark and kill us and do away with us," "castrate us," "rough us up and mug us," "We would never see our parents again." While this was being said defendant put his foot heavily on Edward's back. The result was to "scare [him] very much."
On cross-examination Edward stated that he saw the gun handle and "a part of the metal." He estimated the varnished wood handle was six or seven inches long. He was familiar with guns through his association with Boy Scouts and various police gun exhibits. He was definite in his opinion that this was a "real" gun. As to the threats he asserted, "Not for a minute did I think it was a joke or some sort of a ruse. I knew it was true."
Delatorca, Edward's friend, testified that he lay down immediately upon being told to do so but because he was so scared he didn't pay attention to what transpired or was said.
Andrew Preston, Edward's father, testified that he knew Turi for five or six years and defendant for about one year, and that he would call one or the other on the phone in Plainfield or South Plainfield and place bets with them on horse races. He identified the phone numbers called. He stated he called and placed bets about six days a week. He met Turi once a week (Wednesday) for a payoff or a collection in various places in Somerville. Turi introduced defendant as his partner and stated, "He'll be handling some of your calls from now on." Thereafter, defendant handled 70% of the calls. He further stated that on most *15 occasions he called defendant or Turi but there were times when both of them called him.
Preston further testified that by September 1968 he had accumulated a debt of about $600 in his betting and he was told by Turi that he had a week to pay.
On September 29, 1968, at or about 8 P.M., Preston was visiting in Somerville when he received a telephone call from his son. Thereupon, defendant took over the phone and threatened the two boys at home. Defendant told him that they had the boys "as hostages and they weren't going to release them until they had the money." He further told Preston that if the money wasn't paid in two days "I'll castrate those two boys and if you don't get the money after that, we'll get them a pair of cement shoes. We'll see how they swim." Preston stated he was positive that he was speaking to defendant since he had talked to him on the phone for the past year and recognized his voice. Preston also said he spoke with another person during the phone conversation and although he was not absolutely certain, the voice sounded like Turi's. While he was talking, Preston wrote a note to his friend to go next door, call the police and send them over to his house.
The next morning Turi called Preston and told him that he was not the man at his home the night before and that defendant was not there either.
Robert Ball, manager of the Plainfield business office of the telephone company, testified that two numbers called by Preston were listed in Turi's name and two were in defendant's name. He also identified a number of toll calls made to these numbers from Preston's place of employment in Somerville. Lieutenant Karkowski of the Somerset prosecutor's office testified as to bookmaking operations, stating that the telephoning in of bets was the usual system employed.
Defendant called one Hazel Nargi, who testified that he was employed with her in a bakery shop. She asserted that *16 he did not leave the premises during his lunch hour and received telephone calls "very, very seldom."
Neither defendant nor Turi took the stand but each called additional alibi witnesses.
Defendant first contends that the verdict was against the weight of the evidence as to each crime of which he was convicted. As to the offense of unlawful possession of a weapon, he argues that there was no evidence to show that the firearm was capable of being fired. This he asserts is necessary since a "pistol" is not a pistol within the meaning of N.J.S.A. 2A:151-41 unless, as prescribed by N.J.S.A. 2A:151-1(a), a bullet or missile may be fired therefrom. This point is being raised here for the first time. Defendant did not move for a judgment of dismissal on this ground in the trial court, either at the end of State's case or at the termination of the entire case.
Although young Edward testified that he only saw the handle and a part of the metal exposed from the holster worn by defendant, nevertheless he was positive, based upon his experience with guns, that this was a "real gun." A rational inference from this evidence, tantamount to legal proof of the fact, is that the gun was capable of being fired. The conviction could reasonably rest upon this inference and thus, was not against the weight of the evidence. See State v. Martinek, 12 N.J. Super. 320, 325 (App. Div. 1951). Thus, we find no error, let alone plain error. R. 2:10-2.
With regard to the charge of threats to take a life, defendant claims that the verdict was against the weight of the evidence in that the threat was conditional, equivocal and inconclusive. This claim is without substance. The record contains more than ample evidence from which the jury could have found that defendant seriously and presently threatened the lives of the two boys. The fact that the threats made were conditioned upon the father's failure to pay the money allegedly owed as a gambling debt does not make the threat any the less real. State v. Hamre, 247 *17 Or. 359, 429 P.2d 804, 808 (Or. Sup. Ct. 1967). It is necessary only that the threats impart the expectation of bodily harm or death, thereby inducing fear and apprehension in the person threatened. State v. Lizotte, 256 A.2d 439, 442 (Me. Sup. Jud. Ct. 1969); State v. Cashman, 217 A.2d 28 (Me. Sup. Jud. Ct. 1966). The words used by defendant clearly possessed that characteristic. Cf. State v. Morrissey, 11 N.J. Super. 298, 301-302 (Cty. Ct. 1951).
Defendant's contention that the bookmaking conviction was against the weight of the evidence is without substance. There was more than ample evidence to support this determination by the jury.
Next, defendant asserts the trial court erred in refusing to charge that "there must be an intent to commit the act"  to take a life. He argues that such an intent is prerequisite to a conviction under N.J.S.A. 2A:113-8. This argument lacks merit. As stated above, the gist of this crime is that the words used are of such a nature as to convey the menace or fear to the ordinary hearer. "It matters not whether defendant had or had not the intention later to carry out the threat." State v. Lizotte, supra, 256 A.2d at 442. Thus, the court properly refused defendant's request to charge.
At this point we consider defendant's contention that we should "direct a new trial where newly discovered evidence exculpates one defendant where the convictions against both arose out of the same factual circumstances and they were tried together." The basis of this assertion rests upon another bizarre chapter in this story. On October 24, 1969 James E. Schultheis, defendant's brother, gave the prosecutor's office a voluntary statement wherein he stated that Louis Turi was not present in the Preston home on the night in question  September 29, 1968  but that it was he who was there with defendant. He denied that defendant had a gun. He also asserted that it was he, not defendant, who answered the telephone when Andrew Preston called in his bets. He conceded, however, that defendant *18 knew that a separate phone was located in his house and the purpose for which it was used. He further stated Turi suggested before the trial that he didn't think he was going to be convicted and therefore "Let me go and see how everything goes. If worse comes to worse, then you'll have to go and tell the real story." On December 12, 1969 James Schultheis submitted to a polygraph test and the State Police officer who conducted it concluded that "he gave a truthful statement at the prosecutor's office."
Thereafter, we are told in defendant's brief, and it is not denied by the State, Turi's convictions for breaking and entering with intent to assault Andrew Preston and for threatening the lives of the two boys were vacated. Apparently, the bookmaking conviction was not disturbed. The record does not disclose the manner in which this result was accomplished. Defendant concedes that a fraud was perpetrated upon the lower court, but he attempts to make Turi "the instigator and brains" of the venture and the benefactor thereof.
The statement made by defendant's brother was not "newly discovered" evidence. In order to be of that category the evidence "must have been discovered since the original trial." State v. Sullivan, 43 N.J. 209, 232-233 (1964). Assuming that the plan was conceived by Turi, and we have some doubt of that, it was nevertheless agreed upon and carried out with the knowledge of defendant. The evidence that he now claims to be newly discovered was known to him at the time of trial but concealed with his participation. To allow him the benefit thereof would be to further an admitted attempt to practice a fraud upon the trial court. It may also be noted that the results of a polygraph test, whether favorable or unfavorable to an accused, are uniformly held inadmissible. State v. Driver, 38 N.J. 255, 261 (1962).
Next, we treat with defendant's argument that N.J.S.A. 2A:113-8 is unconstitutional because it is vague and uncertain. This argument was raised and rejected in *19 State v. Gibbs, 134 N.J.L. 366, 367-368 (Sup. Ct. 1946). Cf. State v. Profaci, 56 N.J. 346, 349-353 (1970).
Defendant's assertion that Somerset County did not have jurisdiction to try him on the charge of bookmaking is lacking in merit. R. 3:14-1. A claim of improper venue must be raised by pretrial motion or else it is considered waived. State v. DiPaolo, 34 N.J. 279 (1961); State v. Greco, 29 N.J. 94 (1959). Defendant made no such motion.
Finally, we have considered all other points raised by defendant and conclude that they all are without substance.
Judgment affirmed.