116 N.J. Super. 515 (1971)
283 A.2d 114
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ULIOUS LEE GREEN AND JESSE GREEN, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 1971.
Decided October 19, 1971.
*517 Before Judges KILKENNY, LABRECQUE and LANE.
Mr. David P. Jacobs, Assistant Deputy Public Defender, argued the cause for appellants (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Michael H. Stieber, Assistant Prosecutor, argued the cause for respondent (Mr. Joseph P. Lordi, Essex County Prosecutor, attorney).
The opinion of the court was delivered by KILKENNY, P.J.A.D.
Defendant Ulious Green was found guilty by a jury of assault and battery on a police officer (N.J.S.A. 2A:90-4), carrying a dangerous knife (N.J.S.A. 2A:151-41(c)), and threatening life (N.J.S.A. 2A:113-8). Defendant Jesse Green, who was tried at the same time, was found guilty of the first two charges and not guilty of the last. On February 25, 1970 Ulious was sentenced to New Jersey State Prison for terms of three to five years on each charge, all terms to run concurrently. Jesse was sentenced to Yardville Reformatory for two concurrent indeterminate terms.
In their appeal from the judgments of conviction, defendants contend:
(1) The trial judge's instruction to the jury with regard to the charge of carrying a dangerous knife was erroneous (not raised below).
(2) The trial judge erred in not allowing defendants to testify as to whether or not the knives were a necessary tool in their employment.
*518 (3) Defendant Jesse Green was unlawfully convicted of assault and battery on a police officer, under indictment 54-69. The verdict on that charge was improperly rendered and, therefore, all other verdicts rendered at the trial were thereby tainted.
(4) The judge's charge on threatening to kill was erroneous (not raised below).
(5) Defendant Ulious Green's sentence was illegal in that the judge considered prior arrests not followed by convictions in determining the sentence.
There was testimony and other evidence at the trial from which the jury could make the following findings:
On June 6, 1969 James Butler, a plain clothes security detective for Bamberger's, observed defendants enter the department store and purchase two shopping bags Butler and another detective, Smith, watched from the balcony as defendants put merchandise into their bags. When the two men left the store without paying, the detective pursued them.
Outside the store Butler flagged down an "unmarked" Newark police car. There were three officers in the car. Officer Hagel was driving, Engler was in the front seat and Reid was in the back. The two store detectives got in the car and they quickly overtook the two defendants who were standing on the corner waiting for a light to change.
Officer Engler  in plain clothes  got out of the car with his badge drawn. He approached defendants and said, "Stop. I'm a police officer, I want to talk to you." Defendants immediately fled in opposite directions.
Engler, along with Detective Smith, pursued Jesse. As Engler reached him, that defendant turned and struck the officer in the mouth. Engler than took out his "slapper" (blackjack) and struck Jesse once or twice. He wrestled him to the ground but the handcuffs jammed and the officer needed assistance to get Jesse back to the car.
Officer Hagel apprehended defendant Ulious Green and had him handcuffed and in the car. Hagel was driving with *519 Engler in the middle of the front seat and Butler next to him. Reid was in the rear with the two prisoners. Jesse was bleeding. When Ulious saw this, he became enraged at Officer Engler. He spat at the officer. When Engler turned around in his seat, Ulious leaned back, raised his feet and kicked him in the chest. The officers grabbed Ulious's feet and attempted to subdue him. According to Engler, Ulious shouted that "he was going to kill me. He said that no matter how long he spent in jail when he gets out he's going to kill me * * *." Engler also testified that Jesse said he was going to kill him.
At police headquarters defendants were searched and pocket knives were found in their possession. Defendant continued to threaten Engler while they were at the precinct. The knives were identified and received in evidence.
Both defendants testified. Jesse stated that he never struck Engler, but that when the officer caught him the officer immediately began to strike him with the "slapper." He denied ever threatening Engler. Ulious also denied making the threats. He testified that when he saw Jesse he told him to press charges against Engler. Engler told him to "shut up" or he would "give him some." Ulious challenged Engler saying that if he hit him, he would spit on the officer. Engler struck him with the "slapper" and Ulious spat. Engler then hit him a number of times. Ulious, handcuffed, put up his feet to ward off the blows.
After the usual summations, charge and submission to the jury, the jury returned its verdict. Defendants requested a poll. During the poll of the verdict of guilty as to Jesse Green for assault and battery on a police officer  the second poll  juror No. 8 made no response. The following colloquy took place:
THE COURT: What is your response?
JUROR NO. 8: No.
THE COURT: No what? That's not your verdict?
JUROR NO. 8: No, it was not. Are we talking about the final verdict?

*520 THE COURT: We are talking about the verdict that's just been 
JUROR NO. 8: Excuse me. Wasn't it decided this was unanimous?
THE CLERK: Yes.
THE COURT: I want to know how did you vote. Did you vote in favor of being guilty, Jesse Green, with reference to Indictment 53 of the 1969 Term?
JUROR NO. 8: This is before it became unanimous that the jury decided?
THE COURT: What is your vote? Do you vote in favor?
A JUROR: Now. Now.
JUROR NO. 8: It was yes to make it unanimous.
THE COURT: Whether it be to make it unanimous or not, did you vote to find Jesse Green guilty of assault and battery on a police officer?
JUROR NO. 8: Yes, yes.
Later the juror went and spoke with the trial judge. He told the defense attorney  who had moved for a new trial on the basis of the incident  and the prosecutor that "in view of what she told me I think that this woman ought to be interrogated by you and by Mr. Wolf to decide whether or not this defendant had been proved guilty of the crime charged beyond a reasonable doubt." During a hearing on the motion, the juror testified. She explained that she agreed with the guilty verdict, stating:
Yes. You see, my "no" came because I thought first you asked for a unanimous verdict and that was yes; then when the attorney said, "Poll the individual jurors," I considered that to mean "Before the ultimate verdict how were you thinking?"

I
The first question on appeal is this: Did the court err in its charge concerning possession of a dangerous knife?
N.J.S.A. 2A:151-41(c) provides in part that anyone who has in his possession a "dagger, dirk, dangerous knife or knife as defined in chapter 5 of the laws of 1952 (C. 2A:151-62), stiletto * * * is guilty of a high misdemeanor." (Emphasis added). The trial judge in his charge mentioned *521 only the "dangerous knife." He did not mention "dagger, dirk * * * stiletto," words referrable to objects of the same class as "dangerous knife," that is, sui generis. Cf. Germann v. Matriss, 55 N.J. 193, 220 (1970). He added that "dangerous knife" uses for its meaning "its common, everyday accepted connotation." He stated that it was for the jury to decide whether the State had proven that defendants had possession of a dangerous knife. The knives found in defendants' possession were received in evidence as exhibits and submitted to the jury for inspection. No requests to charge were made on this issue, nor were any objections made to this portion of the charge, as given.
Defendants contend that "dangerous knife" has a meaning other than its ordinary meaning, and that pocket knives cannot be included therein. They also maintain that no sufficient standard for a determination was supplied since the whole section of the statute was not read.
The determination of what is a "dangerous knife" was properly left for the jury. State v. Horton, 98 N.J. Super. 258 (App. Div. 1967), certif. den. 51 N.J. 393 (1968). Cf. Black's Law Dictionary (4th ed. 1951) 471. In Horton the defendant attacked the statute as unconstitutional on the ground that the term "dangerous" was too vague. The knife in that case was a folding pocket knife with a 4 1/2" blade, and was 9" long when opened. This court stated that when the term is viewed in the context of the entire statute it is obvious that the statute contemplates "a knife dangerous to life or human safety; one by the use of which a fatal wound may probably or possibly be given." Id. 98 N.J. Super. at 261. The trial judge had read the pertinent sections of the statute and the jury had the knife in front of them. It was for them to determine whether under the circumstances the knife was dangerous.
Defendants cite People v. Forrest, 67 Cal.2d 478, 62 Cal. Rptr. 766, 432 P.2d 374 (Sup. Ct. 1967). That case is not on point. The court there was called upon to determine whether an oversized pen knife was a "dagger or dirk." Since *522 the blade did not lock in place the majority held that it was not.
Nor is People v. Cricuoli, 157 App. Div. 201, 141 N.Y.S. 855 (App. Div. 1913), very strong authority for their contention. In that case the defendant had a razor in his possession. The statute had at the time of the offense proscribed "dagger, dirk, and dangerous knife." Subsequently, but prior to trial, the statute was amended to include razors, stilettos, etc. The trial court had charged the new statute. The appellate court reversed. They found that the new inclusion showed a legislative intent that razors were not "dangerous knives." Moreover, the charge of the new statute required a reversal.
The proscription of N.J.S.A. 2A:151-41 first appeared in New Jersey in L. 1924, c. 137:
* * * Any person who shall carry any * * * dagger, dirk, dangerous knife, stiletto * * *. [Emphasis added]
In L. 1966, c. 60, this section was redefined and expanded:
* * * razor blades imbedded in wood slivers, daggers, dirk, dangerous knife or knife as defined in chapter 5 of the laws of 1952 (C. 2A:151-62), stiletto * * * [Emphasis added]
The statute does not intend to catalogue all the weapons but merely lists under generic terms the common designation of those prohibited. State v. Witcher, 58 N.J. Super. 464 (App. Div. 1959). There is nothing which would indicate that the Legislature intended "dangerous knife" to mean other than its connotation in everyday parlance  a knife which could be used by the possessor as a weapon. There is nothing which would have led the jury to conclude that the knife must be other than one "dangerous to life or human safety."
The trial judge should have read the whole statute to the jury, especially the list of other dangerous weapons, or *523 should have elaborated more fully on the meaning of "dangerous knife" by giving some guidelines or standards to the jury for reaching a proper conclusion. But such failure did not amount to "plain error," R. 2:10-2, which defendants were required to demonstrate where, as here, no objection was made to the charge and no request for further instruction was submitted.
No argument is made that the knives in issue were not within the rule expounded in State v. Horton, supra.

II
The next question to be answered is, Did the court err in refusing to permit defendants to testify that the knives were necessary for their work?
The determination of whether a knife is dangerous is dependent upon consideration of many factors. One of these is the instrument itself. But this cannot be taken alone; it must be viewed in light of all the circumstances, including its concealment. The fact that the instrument has been used in some lawful fashion at some other time is irrelevant to the determination. The "concealment" of the weapon at the time of the incident constitutes an important factor of the offense, rather than its mere possession at some other time and place for a lawful purpose.

III
Did the confusion of juror No. 8 and the questioning by the trial judge mandate a new trial? This is the third question raised by defendants in their appeal.
In Solar v. United States, 86 A.2d 538 (D.C. Mun. Ct. App. 1952), a similar occurrence had taken place. There, however, the trial judge had entered the judgment of guilty and had never questioned the juror. In the instant case (although the inquiry may have been initiated by the juror or by the motion) a complete inquiry was made in accord with State v. Schmelz, 17 N.J. 227 (1955). It is clear from the *524 final discussion that the juror concurred in the final verdict and was merely confused during the poll. Defendants were not prejudiced.

IV
Did the trial judge err in his charge on threatening to kill? Our conclusion is that there was no reversible error in this aspect of the case.
As conceded by defendants in their supplemental brief, this court held in State v. Schultheis, 113 N.J. Super. 11 (App. Div. 1971), that intent to carry out the threat is not an element of N.J.S.A. 2A:113-8. That case also states, "It is necessary only that the threats impart the expectation of bodily harm or death, thereby inducing fear and apprehension in the person threatened." Id. at 17, citing State v. Lizotte, 256 A.2d 439 (Me. Sup. Jud. Ct. 1969). In Lizotte the court specifically held:
It matters not whether the defendant had or had not the intention to carry out the threat. The essence of an oral threat is that it is a verbal act and if that act is of such a nature as to convey menace to an ordinary hearer, the statute is violated. No more does it matter whether or to what degree the threat engenders fear or intimidation in the intended victim. Some men are braver than others and less easily intimidated. [at 442]
This is a sound rationale. Since Officer Engler's actual reaction was irrelevant there was no error in excluding testimony concerning it.

V
The final question for determination is, Did the court err in considering in a presentence report information concerning "arrests which were not followed by conviction?"
There is an indication that the trial judge "considered" these arrests in fixing Jesse Green's sentence. There is no evidence that the sentence was influenced thereby. A presentence report is submitted to the sentencing judge in order *525 to give him as clear a picture of defendant as is possible so that a proper sentence may be fixed. Williams v. People of New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). Such reports are also "intended to benefit the individual offender and lessen the severity of the penal laws. They were incident to the penological approach which sought, and still seeks, to tailor the sentence to the background and present circumstances of the offender along with the nature of his offense." State v. Kunz, 55 N.J. 128, 132 (1969). The judge can be aided only by being given as complete a picture as possible so long as the picture is accurate. There is no contention here that it is not. Compare State v. Pohlable, 61 N.J. Super. 242 (App. Div. 1960). Nor is there any indication that the judge was misled, mistook arrest for conviction, or this defendant was prejudiced in being given an indeterminate term. Cf. Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948).
While a sentencing judge may "consider" the recital in a presentence report which refers to previous "arrests" which did not result in "convictions," under no circumstances should the mere fact of an "arrest" influence the imposition of sentence, since the most innocent person may be arrested. We are satisfied that in the instant case the concurrent terms meted out were not made greater by reason of the notation of arrests, especially in light of the record of convictions.
We find no valid basis for a reversal of the judgments. Accordingly, the judgments of conviction are affirmed.