114 N.J. Super. 19 (1971)
274 A.2d 810
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH J. SEAMAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 1, 1971.
Decided March 9, 1971.
*22 Before Judges GOLDMANN, LEONARD and MOUNTAIN.
Mr. Walter D. Van Riper argued the cause for appellant (Messrs. Van Riper, Belmont & Villanueva, attorneys; Mr. Frederic C. Ritger, Jr., on the brief).
Mr. David S. Baime, Assistant Prosecutor, argued the cause for respondent (Mr. Joseph P. Lordi, Essex County Prosecutor, attorney).
The opinion of the court was delivered by LEONARD, J.A.D.
The Essex County grand jury returned four indictments against defendant charging him with the following: (1) No. 863  five counts of misconduct in office (N.J.S.A. 2A:85-1); (2) No. 864  conspiracy with one Stanley Broskie to violate the statutes prohibiting misconduct in office and extortion (N.J.S.A. 2A:98-1); (3) No. 865  five counts of bribery (N.J.S.A. 2A:85-1) and (4) No. 866  five counts of extortion (N.J.S.A. 2A:105-1).
Following a jury trial defendant was convicted of all offenses except the bribery charge which was dismissed by *23 the trial court at the end of the State's case. Defendant received a total sentence of 1-3 years in State Prison and a fine of $5000.
Defendant, a certified public accountant since 1928 and an attorney since 1934, was appointed in 1937 to the State Board of Certified Public Accountants (State Board). He became its secretary in 1938 and served in that position until 1968.
The State Board was responsible for preparing, administering and grading the C.P.A. examinations. See N.J.S.A. 45:2A-1 et seq. Although the American Institute of Certified Public Accountants actually prepared the examinations and preliminarily graded the papers, its marks were purely advisory, final responsibility for grades resting with the State Board. N.J.S.A. 45:2A-7. The grades determined by the Institute usually were accepted in the first instance by the State Board and it notified candidates that they passed or failed. However, the grades of a number of those who failed would be reviewed by the State Board and in some cases the Institute grades were changed. The authority for reviewing and regrading these papers was delegated to defendant, he having exclusive jurisdiction and discretion in this respect.
The present charges stem from defendant's alleged improper conduct with regard to his regrading of the examination papers of Francis Cerny, Robert Pacca, George VanHook, Sol Glick, Sidney Stern and Gerrold Berr. Each of these individuals had been students in a cram or review course conducted by Stanley Broskie, a C.P.A. with offices in East Orange, New Jersey. Likewise, each had failed all or parts of the C.P.A. examination. (The examination consisted of four sections: Law, auditing, theory and problems.)
The State contended that each of the named candidates was approached by Broskie who told them that their papers would be regraded if they would pay him a certain sum of money and take an additional sum to defendant at his office. *24 They were to talk to defendant generally about accounting, the examination and their personal situation, then hand him an envelope, usually containing $1000 in small bills. This money was to be for either "his favorite charity" or the Joseph J. Seaman Scholarship Fund, the latter being a fund which defendant had begun (but did not administer) with the proceeds of a testimonial dinner previously given in his honor by the New Jersey Society of C.P.A.'s. No receipts were ever issued for these "contributions."
Incidentally, Broskie was indicted on the conspiracy, bribery and extortion charges along with defendant, but pleaded guilty to the conspiracy charge before defendant's trial began and fined $1000. The other charges were held open.
Robert Pacca (listed as a co-conspirator on the conspiracy indictment, but not included as a defendant) testified that he had taken the C.P.A. examination on several occasions from November 1963 to May 1967 but never passed any of the four portions. After taking Broskie's cram course, Pacca took the November 1967 examination. Before the grades were officially announced, Broskie called Pacca to tell him he had passed two parts. Pacca then went to see Broskie, and Broskie told him he "could get [him] passed" on the other portions of the examination if Pacca were willing to "make a contribution to the scholarship fund" at a total cost of $1500. Pacca agreed to the scheme about ten days later. Approximately one month thereafter Pacca received a letter from the State Board saying he had passed all four parts of the examination. A week later, at Broskie's direction, he brought Broskie an envelope with $500 in cash and then made an appointment to see Seaman, went to his office in Perth Amboy and left $1000 in small bills on his desk. Seaman did not open the envelope in Pacca's presence, give him a receipt, or send a letter of acknowledgment, as he promised he would. Pacca did not deduct the $1000 as a contribution to charity on his income tax return.
*25 On cross-examination Pacca admitted he knew the State Board had the right to regrade the examination papers. He also said that he asked Broskie if he could pay him by check, but Broskie emphasized he should bring cash.
Similar testimony was adduced as to Francis Cerny, George VanHook, Gerrold Berr and Sol Glick, four other co-conspirators listed in the conspiracy indictment, and as to Sidney Stern, all five previously unsuccessful examination candidates. Cerny testified that he had originally brought Broskie envelopes with blank checks. Broskie said they were unacceptable so Cerny cashed the checks and gave both Broskie and Seaman cash in envelopes. VanHook said that when he went to Seaman he gave him the envelope, saying, "I want to contribute the money to the scholarship fund." Berr said Broskie told him, "It will cost you two big ones." Glick told Seaman the money was "for [his] favorite charity." Stern said Seaman picked up his envelope and began, on his own, telling Stern about the laudable aims of the scholarship fund. None of these men was given a receipt for his contribution and none took the contribution as a deduction on his income tax return.
John Kortbawi, an agent for Internal Revenue Service, testified that after he had taken the fourth part of the examination  he had earlier passed the first three parts  he received a letter from Broskie requesting an appointment. When Kortbawi got to Broskie's office, Broskie told him he "didn't quite make it." Kortbawi told Broskie he was an I.R.S. agent, to which Broskie replied, "Wow, you're hot stuff. If I had known that, I wouldn't have called you." However, after ascertaining that Kortbawi did want to become certified, Broskie said, "If I'm going to give you something that you are going to have to pay for, you are gong to have to get something back in exchange for it. * * * [Y]ou're a big boy. You know what the score is in this world." He then told Kortbawi that he would have to make a contribution to the fund in order to pass. Kortbawi testified that Broskie said of Seaman, "As independently *26 wealthy and rich as this man is, he still likes to get a little money on the side." Kortbawi said he reported the incident to a group supervisor and then had an electronic device attached to his telephone. Broskie and Kortbawi had several subsequent conversations pertaining to the amount of the "contribution" that had to be made, and Kortbawi's most recent failure on the examination, all of which were taped and played for the jury. In another conversation Broskie told Kortbawi that he "just got off the phone * * * with the big cheese," in reference to the notification that Kortbawi was soon to get that he passed the examination. Kortbawi said he had visited Seaman earlier to discuss the examination and that he told Seaman at that time he would consider it "an honor" to contribute to the scholarship fund. At that time Seaman indicated to Kortbawi that he did not want there to be any connection between a contribution and the examination.
Defendant took the stand on his own behalf and denied participating in any scheme with Broskie or having improperly accepted payments in his official capacity as Board secretary. He said he recommended Cerny and the others for certification because of the quality of their papers, not because of the contributions. He considered the monies as payments to the scholarship fund, totally unrelated to the regrading. However, he admitted that 22 of the 23 accountants who contributed to the fund had been regraded. Seaman said that on June 3, 1968 he sent a $10,000 check from his personal account to the scholarship fund; this contribution included the contributions made by the successful candidates, although their names were not mentioned in Seaman's letter of transmittal.
In addition to a host of fact witnesses, defendant produced an impressive selection of prominent character witnesses.
Defendant first contends that the introduction into evidence of the tapes of the various Broskie-Kortbawi conversations was prejudicial error because this procedure denied *27 him the constitutional right of confrontation under the Sixth and Fourteenth Amendments. He asserts that all of Broskie's statements on the tape were made out of defendant's presence and were intended to involve defendant, without his knowledge.
Although the United States Supreme Court has recognized that the Sixth Amendment's right of an accused to confront the witness against him is a fundamental right made obligatory on the States by the Fourteenth Amendment, the court, nevertheless, in Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), held:
It is not argued, nor could it be, that the constitutional right to confrontation requires that no hearsay evidence can ever be introduced.

* * * * * * * *
`* * * The issue before us is the considerably narrower one of whether a defendant's constitutional right "to be confronted with the witnesses against him" is necessarily inconsistent with a State's decision to change its hearsay rules.... While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; * * *.'

* * * * * * * *
It seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots. But this Court has never equated the two, and we decline to do so now. [400 U.S. at 80-82, 86, 91 S.Ct. at 215, 216, 218, 27 L.Ed.2d at 222-226]
See also California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 91 S.Ct. at 215, 216, 218, 26 L.Ed.2d 489 (1970).
In this State, Evidence Rule 63(9) provides that
A statement which would be admissible if made by the declarant at the hearing is admissible against a party if * * * (b) at the time the statement was made the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan.
In State v. Boiardo, 111 N.J. Super. 219 (App. Div. 1970), certif. den. 57 N.J. 130 (1970), we declined to hold *28 that the "Confrontation Clause invalidates [the above-quoted] Evidence Rule." [at 230]. We concluded that the "introduction in evidence of hearsay statements made by co-defendants in furtherance of a conspiracy in which [defendant] was a participant did not violate his Sixth Amendment right to be confronted by witnesses against him." Ibid. These declarations of a conspirator constitute an exception to the hearsay rule, affording in the circumstances a sufficient guarantee of testimonial trustworthiness. State v. Carbone, 10 N.J. 329, 341 (1952).
Defendant's assertion that the State failed to prove a prima facie case of conspiracy prior to the admission of the tapes is without merit. In such a situation the threshold requirement for admissibility is satisfied by showing the likelihood of an illicit association between the declarant and defendant. United States v. Ragland, 375 F.2d 471, 477 (2 Cir.1967), cert. den. 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968). Prior to the introduction of the tapes, Pacca, Cerny and the others all testified to the "likelihood" of such an illicit agreement.
Defendant further argues that the very use of the tapes was prejudicial, in that the memorialization on tape of certain testimony tends to highlight it and emphasize it most vividly in the jurors' minds. The use of sound recordings is not inherently prejudicial. State v. Driver, 38 N.J. 255, 287-288 (1962).
Finally, defendant claims that although the recordings might have been evidentially competent as to the conspiracy charge, they played no part in the misconduct and extortion charges and their use was therefore confusing to the jury and prejudicial. There is no basis to this claim. The trial judge in his charge specifically and clearly told the jury that the Broskie tapes could not be considered in relation to the other offenses (besides conspiracy). A similar argument was raised and rejected in State v. Dennis, 43 N.J. 418, 424 (1964).
*29 Based upon all of the above, we conclude that the Broskie-Kortbawi tapes were properly received in evidence and defendant was neither prejudiced nor otherwise thereby denied a fair trial.
Defendant next contends that the trial court committed error in failing to instruct the jury that they could draw an inference adverse to the State from its failure to produce Broskie.
Such an adverse inference is not proper if the witness was available to both parties or "by his position would be likely to be so prejudicial against the party that the latter could not be expected to obtain the unbiased truth from him." State v. Clawans, 38 N.J. 162, 171 (1962); see also Wild v. Roman, 91 N.J. Super. 410, 414 (App. Div. 1966). Broskie was not in custody at the time and his whereabouts was equally known to defendant as well as by the State. Thus, he was available to both parties. Further, the record clearly indicates that even though Broskie originally promised the State that he would be helpful in the prosecution of defendant, thereafter, and before trial, he expressly stated to the prosecutor and his own counsel that he was "hostile to the State" and that he "wants to help the defendant in any way that he can." At the time defendant moved for a Clawans charge, the trial court gave defendant an opportunity to reopen his case and call Broskie as a defense witness but this offer was refused. Under all these circumstances, the judge correctly refused to give a Clawans charge.
Defendant's next contention is that his motion for judgment of acquittal on the conspiracy charge, made at the conclusion of the State's case, should have been granted because there was insufficient evidence of a conspiracy independent of hearsay declarations of the alleged accomplice. We find there was.
A conspiracy may be proved either by direct or circumstantial evidence. State v. Carbone, supra, 10 N.J. at 341. Proof of the existence thereof is generally a matter of *30 inference deduced from certain criminal acts of the parties accused, done in pursuance of an apparent criminal purpose in common between or among them. Ibid. "The prosecutor is permitted to bring in ambiguous and somewhat unrelated acts, statements, conversations and transactions in the hope that when viewed as a whole, the inference of a pre-planned scheme will emerge. In short, when the total effect of the proof indicates sufficiently the existence of a conspiracy, the case must go to the jury." State v. General Restoration Co., 42 N.J. 366, 376 (1964).
We believe the trial court properly denied this motion. Considering the State's evidence in its entirety and giving the State the benefit of all its favorable testimony as well as all the inferences that could reasonably be drawn therefrom, we conclude that the jury could find defendant's guilt of the crime beyond a reasonable doubt. State v. Reyes, 50 N.J. 454, 458-459 (1967). As we have previously indicated, the testimony of witnesses, independent of the tapes, established defendant's direct role in the conspiracy. Among other facts, it was not contradicted that he accepted envelopes from each containing small bills without counting them, immediately after regrading their examinations.
Defendant also maintains that the conspiracy indictment fails to charge a crime, since the offense can only be committed by the concerted action of the parties to it. He bottoms his position upon the so-called Wharton rule of conspiracy. That rule as originally formulated stated that
When to the idea of an offense plurality of agents is logically necessary, conspiracy, which assumes the voluntary accession of a person to a crime of such a nature that it is aggravated by a plurality of agents cannot be maintained. [2 Wharton, Criminal Law (12th ed. 1932), § 1604 at 1862. See also, 1 Wharton, Criminal Law and Procedure (Anderson ed. 1957), § 89 at 191]
Although the existence of this general rule was recognized in State v. Lennon, 4 N.J. Super. 415, 419 (App. Div. 1949), we noted [at 420], "[W]here a crime from a legal *31 standpoint may be committed by one person only, a conspiracy between two or more persons to commit that offense changes the character of the offense and the stated rule does not apply." The Supreme Court affirmed in 3 N.J. 337 (1949) and said:
* * * the conspiracy is also criminal where it contemplated the cooperation of a greater number of parties than were necessary to the commission of the principal offense. Here, the conspiracy [to commit bookmaking] charged and proved included participants who were not indispensable to the consummation of the substantive offense. This is the distinguishing principle * * *. [at 343]
In the instant case the conspiracy indictment charged defendant with conspiring to violate the common law offense of misconduct in office (N.J.S.A. 2A:85-1) and the statutory offense of extortion (N.J.S.A. 2A:105-1).
The crime of misconduct in office is defined to be corrupt misbehavior by an officer in the exercise of the duties of his office or while acting under the color of his office. State v. Begyn, 34 N.J. 35, 49 (1961); State v. Silverstein, 76 N.J. Super. 536, 540 (App. Div. 1962), aff'd 41 N.J. 203 (1963). Having by color of his office received money to which he was not legally entitled by reason of or in connection with his legal duties, defendant was guilty of the crime of extortion under our statute. State v. Begyn, supra, at 47. There is a distinction between that crime and bribery; the latter offense consists in offering a present or receiving one, while the former consists in demanding an illegal fee or present by color of office. 31 Am. Jur.2d, § 2, p. 902. See State v. Begyn, supra, at 45-48. The purpose of our extortion statute was simply to punish the officer who illegally took the fee. Id. at 46. In bribery both the officer and the recipient are guilty of the offense. Id. at 48.
The substantive crimes of misconduct in office and extortion set forth in the conspiracy indictment could be and were committed by defendant alone when he received money which he was not officially entitled to and then corruptly *32 regraded examination papers. Furthermore, Broskie and the others were not indispensable to the commission of misconduct in office and all of them were not indispensable to the extortion. Therefore, we hold the so-called Wharton rule to be inapplicable. See United States v. Smolin, 182 F.2d 782, 786 (2 Cir.1950); United States v. Corallo, 281 F. Supp. 24, 29 (S.D.N.Y. 1968); United States v. Cogan, 266 F. Supp. 374 (S.D.N.Y. 1967).
Finally, defendant asserts that the indictment charging the offenses of misconduct in office, alleged to have happened in Middlesex County, was improperly and unlawfully returned by the Essex County grand jury, and placing defendant on trial thereon in the latter county was illegal and prejudicial to his constitutional rights. This point is utterly without merit. Venue is not jurisdictional, it is merely a matter of practice and procedure, as long as it appears the offense was committed within the State. State v. DiPaolo, 34 N.J. 279, 287-288 (1961); State v. Greco, 29 N.J. 94, 104 (1959). Hence, a question of venue does not implicate the jurisdiction of a grand jury. In re Salvi, 34 N.J. 450, 451 (1961). Further, a claim of improper venue must be raised by pretrial motion or else is considered waived. State v. DiPaolo, supra, at 288; State v. Greco, supra, at 105; State v. Schultheis, 113 N.J. Super. 11, 19 (App. Div. 1971).
Additionally, although the indictment alleges only offenses in Middlesex County, it appears that the solicitation of the offenses was committed by an aider and abettor in Essex County, Broskie's office being in East Orange. In no event do we find that defendant suffered prejudice by the Essex County indictment and trial.
Judgment affirmed.