UNITED STATES of America ex rel. Joseph J. SEAMAN, Petitioner,

v.

John CRYAN, Sheriff of the State of New Jersey of Essex County et al., Respondent.

Civ. No. 1045–71.

United States District Court, D. New Jersey.

Aug. 5, 1971.

**876**

Walter D. Van Riper and Frederic C. Ritger, Jr., Newark, N. J., on the brief, for petitioner.

Joseph P. Lordi, Essex County Prosecutor by David S. Baime, Chief, Appellate Section, Newark, N. J., for respondent.

## MEMORANDUM and ORDER

LACEY, District Judge:

The relator seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241 et seq. Tried in Superior Court of New Jersey, Law Division, Essex County, he was found guilty by a jury on three separate indictments for (1) official misconduct in violation of N.J.S.A. 2A:-85–1, (2) a conspiracy to extort in violation of N.J.S.A. 2A:98–1, and (3) extortion in violation of N.J.S.A. 2A:-105–1. He was thereafter sentenced overall to 1–3 years and fined $5,000.

The conviction was affirmed by the Superior Court, Appellate Division, State v. Seaman, 114 N.J.Super. 19, 274 A.2d 810 (1971), and the Supreme Court of New Jersey, on July 8, 1971, 279 A.2d 679, denied certification. On July 12, 1971, this petition was filed, and at the same time, an order was signed in this Court continuing relator on bail.

The relator raises in his petition one narrow constitutional question: were his rights under the Confrontation Clause of the Sixth Amendment,[1] applicable to the states through the Fourteenth Amendment,[2] abridged when the State placed before the jury hearsay statements made by one Stanley Broskie, an alleged coconspirator of relator, to various State witnesses who, with one exception, were also named as coconspirators, where Broskie himself, a severed co-defendant as well, was, while available, not called by the State to testify?

Secondary to, and as a part of this basic question, the relator strenuously asserts constitutional impropriety in the trial judge's having permitted the State to supplement and corroborate the in-court testimony of one of the coconspirator witnesses (Kortbowi) by recordings of telephone conversations between him and Broskie.[3]

The broad confrontation issue was squarely raised at the trial level and

---

1. The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him. * * *"

2. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

3. Broskie, indicted with the relator as a co-defendant and coconspirator, had been severed prior to trial and had pleaded guilty "to one count and was sentenced to pay a fine of $1,000." Since the trial "the severed counts * * * have * * * been dismissed. * * *" (Petition for Writ of Habeas Corpus, para. 4). On oral argument counsel were agreed that the guilty plea was addressed to the conspiracy count.

again in the Appellate Division. However, it was not so precisely raised in the Petition for Certification addressed to the Supreme Court of New Jersey. Point I thereof is entitled "The admission of the tape conversation between Kortbowi (the witness) and Broskie, a defendant, whose case had already been disposed of, was reversible error." Thereafter, the emphasis in the ensuing argument is placed upon the recording, not upon the extensive hearsay now challenged. As put by the relator in the Petition for Certification: "The introduction of Kortbowi's testimony verbally relating his conversation with Broskie, even although [sic] it was out of the presence of the defendant, would have been one thing and might of [sic] itself been admissible without error." Thus the Petition for Certification does not complain of the admission of the hearsay testimony of Kortbowi, or others, allowed by the trial judge under the co-conspirator exception.

Nonetheless, while relator's compliance with the comity doctrine of exhaustion of state remedies may fairly be questioned, Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), this Court may permissibly proceed, as hereinafter set forth, to resolve the posed substantive issue. United States ex rel. Speaks v. Brierley, 417 F.2d 597 (3 Cir. 1969); In re Ernst's Petition, 294 F.2d 556 (3 Cir. 1961). See United States ex rel. Turner v. Rundle, 438 F.2d 839 (3 Cir. 1971), notes 26, 28; *cf.* Williams v. Oriscello, 441 F.2d 1113 (3 Cir. 1971).

No detailed factual recital of all the testimony is required. Careful review of the record[4] and analysis of the state court appellate briefs indicate substantial, if not absolute agreement between counsel on the material facts as developed at the trial, and as ultimately embodied in the opinion of the New Jersey Superior Court, Appellate Division. *See* Opinion in the Petition for Certification (P–4), 1a–13a.

Nonetheless, for an understanding of the constitutional question raised by this Petition the following facts are deemed significant.

The relator, a Certified Public Accountant and practicing Attorney, as Secretary of the State Board of Certified Public Accountants ("Board") during the relevant period, had the sole and exclusive right to review and upgrade to passing marks examination grades of unsuccessful examinees applying for C.P.A. certification in the State of New Jersey.

The charges in the Indictment stemmed from relator's upgrading to passing the examination papers of Messrs. Pacca, Stern, Van Hook, Glick, Berr, and Cerny.[5] All had previously failed on several occasions at least one part of the four-part C.P.A. examination and thereafter had. enrolled in the "cram" or "coach" course, conducted by Broskie, and designed to prepare enrollees for the Board examination.

Pacca, having failed two of four parts of the examination, was told by Broskie that he could get his paper regraded to passing for $1,500. cash, and, accepting the proposition, Pacca thereafter was upgraded to passing, paid $500. cash to Broskie, and, at Broskie's direction, $1,000. in cash to the relator at his office, telling the relator, as Broskie had directed, that the cash was for the Joseph J. Seaman Scholarship Fund. There actually was such a Fund, duly administered, which enjoyed tax exempt status and contributions to which were tax deductible. When the relator accepted Pacca's $1,000. he said, according to Pacca, that he thought "I would

---

4. In this proceeding. Trial Transcripts are marked P–5 through P–14. Other exhibits are: P–1 (Q. and A. of Stanley Broskie by Prosecutor, May 8, 1969); P–2 (Appellate Division Brief and Appendix of Defendant); P–3 (Defendant's Reply Brief in Appellate Division); P–4 (Defendant's Petition for Certification and Supplemental Appendix); D–1 (State's Brief in Appellate Division); D–2 (State's Supplemental Brief-letter).

5. All but Stern were named as coconspirators of the relator and Broskie.

have passed the exam anyway next time and that he was kind of helping me out, going out on a limb, to kind of push me ahead." The relator accepted the cash, did not count it, did not inquire about how Pacca knew of the Fund, gave no receipt, and did not advise of the deductibility of the "donation", although the relator knew a bona fide gift to the Fund was deductible. Pacca, of course, never claimed a deduction on his own return. The Fund's records showed no contribution from Pacca.

Stern's testimony mirrored Pacca's. Having failed, he was told by Broskie he could be upgraded to passing for $1,500. in cash. Stern agreed to the proposition. He too was upgraded to passing, gave $500. to Broskie and, at the latter's direction, delivered $1,000. to the relator, again in cash. Stern testified he simply put the cash, in an envelope, on the relator's desk without saying a word. It was the relator who mentioned that it was for the scholarship fund. In all other respects, the transaction matched that in which Pacca was involved.

Van Hook was sent to the relator by Broskie to review a failing test paper, and at this meeting the relator promised him a review. Shortly thereafter Van Hook received word that he had been upgraded to passing. Broskie then told him: "I will tell you how much it is going to cost." The message was the same, $500. to Broskie and $1,000. to the relator, for the scholarship fund. Van Hook delivered the $1,000. cash to the relator, telling him "I appreciate the regrade. I want to contribute to the scholarship fund." The relator replied: " * * * be a credit to the profession." The rest of the transaction was similar to that involving Pacca and Stern.

Glick too had met with the relator at Broskie's suggestion and thereafter took the examination. A month later he called the relator to discuss his performance but was told he was premature. Thereafter he met with the relator who told him he had failed but that he, the relator, "would see what he could do."

Still later Glick received word he had been regraded to passing. He told Broskie of what had occurred and once again the direction to deliver $1,000. to the relator was given. Glick did in fact hand $1,000. in cash to the relator, telling him it was for his "favorite charity." Again, the relator did not issue a receipt, did not count the cash in Glick's presence, did not discuss his "favorite charity" or even ask whether or not there was any subjective connection between the regrading and the gift of cash.

Berr, following an examination, was told by Broskie that he had failed two parts of it but that Broskie could arrange for a regrading to passing for "two big ones." Berr then met the relator at Broskie's suggestion and told him he wanted to make a contribution to the scholarship fund. Berr thereafter got word he had been regraded to passing and subsequently, at Broskie's direction, delivered $1,000. cash to the relator, under circumstances substantially like those surrounding the other cash deliveries.

Cerny, unsuccessful in the November, 1965, and May, 1966, examinations, enrolled in Broskie's course just prior to the November, 1966 examination. At Broskie's suggestion, Cerny met the relator who told him his paper would be reviewed.

Cerny took the November, 1966, examination but failed it, then took the May, 1967, examination, and failed again, but Broskie told him he would arrange to have the paper reviewed. A few months later, even before Cerny got formal notice, Broskie called him to tell him he had been regraded to passing, and that it would be necessary for him to make a donation to relator's scholarship fund. Again, $1,000. in cash went to the relator, under the same circumstances as with the others.

Kortbowi is in a different category. He was never upgraded to passing and never paid any cash to the relator. He was an Internal Revenue Service agent who was approached by Broskie in

typical fashion. Broskie bluntly told him he would have to make an appointment for him "with Joseph Seaman".

Thereafter, at Broskie's suggestion, Kortbowi met with the relator and, following Broskie's instructions, said he wanted to contribute to the relator's scholarship fund. The relator said he would help him with or without a contribution. Kortbowi reported the matter to his superior and recordings were made of telephone conversations between Kortbowi and Broskie (*See* Factual Statement, State's Brief in Appellate Division, D–1, pp. 14, et seq.)

These telephone conversations were damaging to the relator's interests at the trial, as was Kortbowi's testimony.

Kortbowi had no further conversations with the relator and Broskie was arrested before Kortbowi received formal regrading. As stated, he never delivered any cash to the relator.

Each of the men who had delivered $1,000. to the relator, and Kortbowi, testified as to conversations they had had with Broskie. It is this testimony (and the Kortbowi-Broskie telephone recordings) which was admitted pursuant to the coconspirator exception, and admission of which the relator now claims violated his confrontation rights.

The relator does not claim that the hearsay statements of Broskie were not in furtherance of the alleged conspiracy.

Preliminarily, there is something that needs to be said, for the courts, for litigants, and for the people of this country who are distressed at the inability of our courts to discharge their business. This proceeding, commenced just a few days after the New Jersey Supreme Court denial of certification, dramatizes the recurrent utilization of federal habeas corpus for what is becoming, practically speaking, one more appeal. The Court of Appeals of this Circuit has recently stated in Williams v. Oriscello, 441 F.2d 1113, 1114 (3 Cir. 1971):

> " * * * the Supreme Court made it clear * * * that federal habeas corpus may not be used in lieu of an appeal itself, since this would 'subvert the entire system of state criminal justice' and would permit the use of habeas corpus 'as a matter of procedural routine to review state criminal rulings.' "

This Court too is concerned at the developing trend among able and assiduous counsel to tack on to their state court appeals, "as a matter of procedural routine", federal habeas corpus proceedings. Though it may be futile or ineffectual for a District Judge to proclaim it, this is, it would seem, a perversion of the Great Writ. *See* Nelson v. O'Neil, 402 U.S. 622, 630–634, 91 S.Ct. 1723, 1728–1729, 29 L.Ed.2d 222 (June 1, 1971), Justice Harlan concurring, quoting from his dissent in Mackey v. United States, 401 U.S. 667, 675, 691, 91 S.Ct. 1160, 1171, 1179, 28 L.Ed.2d 404, 410 (April 5, 1971):

> "No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved."

Relator's eminent counsel I do not criticize. They represent their client vigorously and ably. My cavil is aimed at the distortion of the Writ, a distortion now so institutionalized that legal representation which does *not* routinely travel the course of federal habeas corpus, after unhappy state appellate experience, is becoming a rarity. Legislative relief is sorely needed!

Proceeding to the matter at issue, relator's petition, as it complains of the admission of hearsay testimony against him, omits one very significant averment: Broskie, whose extra-judicial statements to the State's witnesses were testified to by them, was charged with being a coconspirator and co-defendant of the relator. The witnesses themselves, with one exception, were also charged coconspirators, but not defendants.

Inquiry, therefore, initially must be directed to ascertaining whether, aside from the objected to hearsay statements, there was sufficient evidence of a conspiracy involving the relator. The answer is manifest: there was. The Appellate Division opinion properly puts this point in focus, 114 N.J.Super. at 28, 274 A.2d at 814:

"Defendant's assertion that the State failed to prove a *prima facie* case of conspiracy prior to the admission of the tapes is without merit. In such a situation the threshold requirement for admissibility is satisfied by showing the likelihood of an illicit association between the declarant and defendant. United States v. Ragland, 375 F.2d 471, 477 (2 Cir. 1967), cert. den. 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968). Prior to the introduction of the tapes, Pacca, Cerny and the others all testified to the 'likelihood' of such an illicit agreement." (emphasis in original)

The Appellate Division dealt with the issue further, 114 N.J.Super. at 29–30, 274 A.2d at 815:

"[Defendant contends] there was insufficient evidence of a conspiracy independent of hearsay declarations of the alleged accomplice. We find there was.

A conspiracy may be proved either by direct or circumstantial evidence. State v. Carbone, *supra,* 10 N.J. [329] at 341, 91 A.2d 571.

"* * * Among other facts, it was not contradicted that he accepted envelopes from each containing small bills without counting them, immediately after regrading their examinations."

There was adequate support in the record to support the Appellate Division's determination. 28 U.S.C. § 2254 (d); United States ex rel. Dickerson v. Rundle, 430 F.2d 462 (3 Cir. 1970).

The federal rule in this respect, requiring sufficient "independent" evidence of a defendant's involvement in a conspiracy before a coconspirator's hearsay declarations can be considered, is like that applied in this case by the Appellate Division.

Thus in United States v. Weber, 437 F.2d 327, 337 (3 Cir. 1970), note 11, Judge Adams stated:

" 'It is enough if evidence, other than that whose admissibility is under challenge, disclosed one [a conspiracy]. St. Clair v. United States, 1894, 154 U.S. 134, 149, 14 S.Ct. 1002, 38 L.Ed. 936; United States v. Pugliese, 2 Cir. 1945, 153 F.2d 497, 500; People v. Luciano, 1938, 277 N.Y. 348, 14 N.E.2d 433.' United States v. Annunziato, *supra,* at 378." (293 F. 2d 373 (2 Cir. 1961).

Subsequent to *Weber* the Third Circuit Court of Appeals reiterated the same principle in United States v. DeCavalcante et al., 440 F.2d 1264, 1272 (3 Cir. 1971), at note 13:

" * * * hearsay statements of co-conspirators whether or not named in the indictment are admissible at trial, provided a conspiracy involving them is in fact established at trial."

*And see* United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174 (3 Cir. 1970), approving the admission of hearsay statements of a coconspirator after "a prima facie case of conspiracy had been made out. * * " 433 F.2d at 196. See also Parness v. United States, 415 F.2d 346 (3 Cir. 1969).

Guideposts were set most recently in this Circuit for federal conspiracy trials by United States v. Bey et al., 437 F.2d 188 (3 Cir. 1971):

" * * * While it is true that hearsay statements are inadmissible when no independent evidence links the declarant to the defendant, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the threshold requirement for admissibility is satisfied by presenting a likelihood of an illicit association * * * The trial judge has wide discretion and need only be satisfied, if he accepts the independent evidence as credible,

that such evidence is sufficient to support a finding of joint undertaking. * * *"

*Bey* then quotes from United States v. Geaney, 417 F.2d 1116, 1120 (2 Cir. 1969):

"* * * the judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances. If it has, the utterances go to the jury for them to consider along with all the other evidence in determining whether they are convinced of defendant's guilt beyond a reasonable doubt. * * *"

New Jersey's procedures are congruent and there is ample support in the record to support the determination of the state trial and appellate courts that the prosecution, in the words of *Geaney*, had "proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances." [6]

The hearsay declarations complained of were admitted under New Jersey's Evidence Rule 63(9), providing:

"A statement which would be admissible if made by the declarant at the hearing is admissible against a party if * * * (b) at the time the statement was made the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan."

This rule is not only co-extensive with the federal coconspirator hearsay exception but is also well within the conspiracy hearsay exception to the confrontation requirement. United States v. Bey et al., 437 F.2d 188 (3 Cir.

1971). *See also*, Dutton v. Evans, 400 U.S. 74, 81–82, 91 S.Ct. 210, 27 L.Ed. 2d 213 (1970), referred to in United States v. Weber, *supra*, 437 F.2d at 340.[7]

■ Accordingly, the broad claim that confrontation rights of the relator were violated is without merit.

The relator, however, carries his argument beyond this point. He next claims that where the coconspirator declarant is physically available, it is the State's obligation to call him as a witness. This is a position which rests in part upon the Confrontation Clause but may be also said to implicate due process principles of a fair trial. *See*, Justice Harlan's concurring opinion in Dutton v. Evans, *supra*, 400 U.S. at 96–97, 91 S.Ct. 210. This contention superficially draws some support from Third Circuit dicta in *Weber, supra*, where Judge Adams wrote (437 F.2d at 338):

"Recent Supreme Court cases— Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)—have expanded the Government's obligation to provide a defendant with the opportunity to cross-examine the witnesses testifying against him, when it is within the Government's power to do so."

*Weber* then adds (437 F.2d at 338):

"However, none of these decisions has altered the traditional understanding that the Confrontation Clause does not prohibit all hearsay exceptions, nor do any of the decisions involve statements made by a co-conspirator who had died before testifying."

---

6. Relator's counsel on oral argument, held July 22, 1971, virtually conceded this.

7. "* * * Indeed, as indicated in *Dutton* the federal evidentiary rules of hearsay may be more stringent than the constitutional limits embodied in the Sixth Amendment. *Dutton, supra*, 400 U.S. at 74, 91 S.Ct. 210."

*Weber* of course involved hearsay declarations of a deceased coconspirator. *Weber* in that connection states, 437 F.2d at 336:

"When the co-conspirator declarant is available as a witness,[8] there is no doubt that hearsay principles do not prevent the introduction into evidence of extra-judicial statements made by the co-conspirator in furtherance of the conspiracy. The fact that Burgess had died before trial strengthened, rather than weakened, the Government's argument for admitting the extra-judicial statements." (Original footnotes omitted).

Finally, after mention of the viability in the Third Circuit of the "co-conspirator exception * * * [to] the Confrontation Clause" as chronicled in American Radiator, *supra*, Judge Adams stated in *Weber*, 437 F.2d at 339.

"Had Burgess been alive at the time of trial and available to be subpoenaed by the Government, this case would present substantially different issues[9]; but since the Government cannot be faulted for Burgess' absence from Weber's trial, and since *Delaney* [Delaney v. United States, 263 U.S. 586, 44 S.Ct. 206, 68 L.Ed. 462] controls the precise issue here, we hold that Weber's Sixth Amendment rights were not violated."

Obviously the immediately preceding quotation from *Weber* requires analysis. Is there to be found in Judge Adams' words a suggestion to the District Courts of this Circuit that the Confrontation Clause requires that the coconspirator exception be cut back or narrowed to require the Government to call as a witness one in Broskie's position where he is available?

In interpreting Judge Adams' words, this Court finds it not without significance that *Weber*, 437 F.2d at 336, note 9, cites United States v. Annunziato, 293 F.2d 373 (2 Cir. 1961), where the declarations of a deceased coconspirator were admitted into evidence, and states: "Judge Friendly, on behalf of an unanimous panel, rejected the argument that such testimony was inadmissible and did not even discuss the fact that the declarant, like Burgess, had died before trial."

Additionally, *Weber* was decided against the background of the recently decided Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.E.2d 213 (1970), from which Judge Adams draws heavily in his opinion. An analysis of *Dutton* is therefore in order.

*Dutton* is the most recent Supreme Court decision on the interweaving of the strands of the confrontation imperative with the coconspirator hearsay exception.

Justice Stewart put it forthrightly and squarely (400 U.S. at 80, 91 S.Ct. at 215):

"It is not argued, nor could it be, that the constitutional right to confrontation requires that no hearsay evidence can ever be introduced.

* * * * * *

" * * * Appellee does not challenge and we do not question the validity of the coconspirator exception applied in the federal courts."

Justice Stewart then defined the federal "exception" to require that the "out-of-court statement of one conspirator to be admitted against his fellow conspirators" must have been made "in the course of and in furtherance of the conspiracy." It of course clearly appeared that the objected to statement in

---

8. Interestingly, and perhaps significantly, the words "available as a witness" are used, rather than words imposing an obligation upon the Government to "call the witness" on its case.

9. Relator, whose counsel in this proceeding also represented Weber, seeks to derive support from these words "this case would present substantially different issues." He of course recognized at oral argument on this petition that, had Broskie been dead prior to trial, relator's petition would have been squarely within *Weber*.

*Dutton,* admitted by a Georgia trial court, was made, as Justice Stewart put it, "during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise." (400 U.S. at 81, 91 S.Ct. at 216).

*Dutton,* therefore, dealt with an extension of the so-called "federal exception" so that Justice Stewart was impelled to say, in refining the legal issue presented:

> "But it does not follow that because the federal courts have declined to extend the hearsay exception to include out-of-court statements made during the concealment phase of a conspiracy, such an extension automatically violates the Confrontation Clause." * *

The "limited contours" of the hearsay exception in federal conspiracy trials, *Dutton* states, are shaped not by the Sixth Amendment, but rather by the Supreme Court, acting through its rule-making power, to implement its " 'disfavor' of 'attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions.' " (400 U.S. at 82, 91 S.Ct. at 216).

As stated in *Weber* (437 F.2d at 338), and in *Dutton* (400 U.S. 83–87, 91 S.Ct. 210), recent decisions of the Supreme Court have reversed state court convictions because of the denial of the constitutional right of confrontation, a decisional trend which has, according to *Weber,* "expanded the Government's obligation to provide a defendant with the opportunity to cross-examine the witnesses testifying against him, when it is within the Government's power to do so." (437 F.2d at 338). However, as both *Weber* and *Dutton* further point out, the cases cited in support of this "trend" are not within the conspiracy exception.[10] Not one stands for the

proposition urged upon this Court, that where the coconspirator declarant is available the State must call him as a witness in order that he can be cross-examined on his extra-judicial "conspiracy furthering" utterances. *Dutton* obviously regards them as of no precedential effect upon the issue before the Court in that case (400 U.S. at 87, 91 S.Ct. 210) ; and *Dutton* and *Weber,* read together, do not convey to this Court that the relator in the case at bar was, under the present state of the law, deprived of his confrontation right.

*Dutton* does hint at the possibility of prosecutorial misconduct cutting back on Confrontation Clause exceptions (Justice Harlan, concurring. 400 U.S. at 98, 91 S.Ct. 210, referring to Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)), and, in that light, it is not inappropriate to explore what happened at the trial of this case to cast light on why Broskie, the coconspirator, was not called by the State.

Some 4-months prior to trial the State had obtained from Broskie an incriminatory statement in written question and answer form in which he confirmed the outlines of the conspiracy between the relator and himself. This statement also confirmed the later trial testimony given by the men who delivered cash to Broskie and the relator as to conversations they said they had with him; as to Broskie's ability to get the relator to upgrade their examination papers; as to instructions they received from Broskie in setting up meetings with the relator; and as to the directions Broskie gave them on how, when, and where they were to deliver their $1,000. in cash to the relator. By this statement Broskie not only confessed his own wrongdoing and implicated the relator, but he did so in terms which conformed substantially to

---

10. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed. 2d 314 (1966); Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968) (holding *Bruton* applicable to the States and retroactive).

the testimony given at the trial by the men who paid.[11]

Of course, Broskie in his statement leaves no doubt why he was making a full disclosure. He had been promised that he could plead guilty to one count of an Indictment (he was fined $1,000.) and that the remaining counts would then be dismissed. Even with the shadow thus cast upon his credibility, it is clear to this Court, and was conceded at argument before this Court by relator's counsel, that testimony by Broskie in accordance with the statement would have been most damaging to his client.[12] Two conclusions, neither of which reflects "prosecutorial misconduct," emerge. First, there was no concealment by the prosecutor of exculpatory information since he made the statement available to the defense and it was incriminatory, not exculpatory; second, the prosecutor cannot be charged with withholding from the jury information vital to the defense.

The practical question may then be asked: Why did the State not call Broskie? The answer is two-fold. No statutory or decisional law of New Jersey required that it do so; and, in terms of trial strategy, information had come to the prosecutor which led him, on a defense motion at the trial's close for mistrial for the State's failure to call Broskie, to state to the trial judge and to defense counsel: " * * he [Broskie] has told his counsel in my presence to inform you that he wants to help the defendant in any way that he can * * * so I hardly think that he is a witness that's under control of the State." (Transcript, p. 1341). The prosecutor also stated on the record that he was going to dismiss the open In-

dictments against Broskie, no matter what happened, and that Broskie was readily available to be called as a witness by the defense. (This latter fact was, at oral argument before this Court, conceded by relator's counsel to have been true.) The prosecutor also said he would not object to defendant reopening his case (Transcript, p. 1330) and the trial judge offered counsel the opportunity, which was declined, to do so.

The mistrial motion was denied.

During summations, defense counsel argued inferences flowing from the State's failure to call Broskie (Transcript, pp. 1364, 1407) and the prosecutor retaliated in kind (Transcript, pp. 1448–9).

Certainly there was nothing in these facts that smacks of "prosecutorial misconduct." [13]

Justice Stewart, in *Dutton*, also dwelt upon "indicia of reliability" and, in that connection, this Court notes that Broskie's pre-trial statement (P–1) differed in no material detail from the hearsay evidence introduced at the trial. Moreover, the relator himself testified and confirmed substantially much of what Broskie was charged with, and admitted in his statement, having said. Thus the relator admitted conversations concerning regrading; that, as Broskie said, he and he alone could regrade; that he did regrade; and that, when, thereafter, cash was offered to him for his Scholarship Fund, he would and did accept it.

The jury had before it a case of accounting applicants, desirous of becoming Certified Public Accountants, in the majority of cases desperate because of repeated failures (one man had fail-

---

11. This statement was marked DJ–1 *Id.* at the trial and P–1 in this proceeding.

12. Defense counsel received a copy of this statement just prior to trial.

13. In *Dutton* both Justice Stewart in the plurality opinion, and Justice Harlan concurring, noted that the coconspirator de-

clarant was available for subpoena by the defendant (400 U.S. at 88 and 96, 91 S.Ct. 210). *See also* United States v. Panepinto, 430 F.2d 613, 616 (3 Cir. 1970), cert. denied, Orangio v. United States, 400 U.S. 949, 91 S.Ct. 258, 27 L.Ed.2d 256 (1971).

ed "thirteen to fifteen" times), who were vulnerable and sensitive to the suggestion from Broskie that they could have past failures regraded to passing in return for a cash contribution to Seaman's Scholarship Fund. Seaman, the relator, was vital to the scheme. Only he could regrade. He dealt with the applicants personally, subtly and with sophistication. But no amount of sophistry can obliterate or even blur the unaccountable termination of each of the regrading transactions: the relator accepting from the candidates $1,000. in cash in small bills, without a receipt, without asking for a check, without even an inquiry about how the "donor" had heard of the Scholarship Fund. This is hardly unimpeachable conduct, made even more questionable by the relator's professional qualifications as an experienced accountant and practicing lawyer. The "indicia of reliability" test was more than met.

Finally, as was the case in *Dutton* (400 U.S. at 78, 91 S.Ct. 210), and *Weber* (437 F.2d at 340), the relator here had the "full opportunity to cross-examine those witnesses who repeated * * * [Broskie's] extra-judicial statements in order to test the accuracy of their testimony * * *." (*See Weber, supra,* at 340).

■ Examining *Weber* again, now in light of our sifting of *Dutton*, it is clear that the Third Circuit in *Weber* did not hold that a State, proceeding as the New Jersey courts in this case did, would thereby violate the Confrontation Clause.[14]

Relator's brief urges that Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), applies. As stated in United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174 (3 Cir. 1970), and Parness v. United States, 415 F.2d 346 (3 Cir.

1969), *Bruton* did not "invalidate" the hearsay exception rule in conspiracy cases. Moreover, as pointed out in *American Radiator, supra,* 433 F.2d at 194, "the United States Supreme Court held in 1924 that the conspiracy exception did not deny a defendant his right of confrontation. Delaney v. United States, 263 U.S. 586, 44 S.Ct. 206, 68 L.Ed. 462." *See also,* Nelson v. O'Neil, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (June 1, 1971).

California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), has also been urged upon us. But *Green* was a non-conspiracy criminal case and the Court of Appeals of this Circuit has stated that "We do not find that *Green* alters our conclusion that we are bound by holdings that use of the co-conspirator exception does not violate the Confrontation Clause." [15]

■ In summary, the coconspirator exception to the Confrontation Clause, along with other hearsay exceptions, still stands; New Jersey's procedures, as applied to the relator, were constitutionally proper; the relator received a fair trial; and there was an abundance of evidence to support the verdict of the jury that he was guilty as charged.

■ The day may come when a higher court decides that the conspiracy doctrine is to be discarded. Until it does, there is no confrontation issue presented by the admission of hearsay statements of a coconspirator. For under the law of conspiracy, acts, whether they be physical or verbal, by one conspirator in the course of, and in furtherance of, the conspiracy are regarded as the acts of the others in the conspiracy: it is as if those others committed those acts, or made the statements. Van Riper v. United States, 13 F.2d 961, 967 (2 Cir.), cert. denied, Ackerson v. United States, 273 U.S. 702,

---

14. Nor is there a constitutional violation in the Kortbowi-Broskie recordings. They corroborated Kortbowi's testimony as to Broskie's statements. Because they may have made him a more credible witness than he otherwise might have been does not render them constitutionally bad.

*Cf.* United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

15. United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174, 194 (3 Cir. 1970).

47 S.Ct. 102, 71 L.Ed. 848 (1926). How then can there be a constitutional confrontation issue? [16]

On the other hand, there may arise a due process issue, under certain circumstances not present in this case, and of course, on a case by case basis, the courts can continue to permit the co-conspirator exception to survive.

The record has been sufficient for the determination of the petition and no evidentiary hearing is required. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Moreover, the relator's counsel, at oral argument, disclaimed the necessity for taking of testimony in this proceeding.

For the foregoing reasons,

It is, on this 5th day of August, 1971,

Ordered that the petition of Joseph J. Seaman for a writ of habeas corpus be and hereby is denied, and this Court certifies there is no probable cause for appeal from this Order;

And it is further ordered that the Order entered in this proceeding on July 12, 1971, releasing the relator on bail, be and hereby is vacated.

---

16. *But see* Justice Marshall's dissenting opinion in Dutton v. Evans, *supra*, 400 U.S. at 100, 91 S.Ct. 210. *See* Levie, Hearsay and Conspiracy—A Reexamination of the Conspirator Exception to the Hearsay Rule, 52 Mich.L.Rev. 1159, 1164 (1954); 4 Wigmore, Evidence § 1080 (a) (3d ed. 1940).