150 N.J. Super. 61 (1977)
374 A.2d 1229
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
DONALD A. FARINELLA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 18, 1977.
Decided May 4, 1977.
*62 Before Judges BISCHOFF, MORGAN and KING.
*63 Mr. Frank P. Lucianna argued the cause for appellant (Messrs. Lucianna, Bierman & Stillman, attorneys; Mr. Thomas J. Pisarri, on the brief).
Ms. Janice S. Mironov, Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Ms. Marianne Espinosa, Deputy Attorney General, of counsel and on the brief).
PER CURIAM.
Defendant-appellant Donald A. Farinella and codefendant Edward Gola were charged in a six-count indictment as follows:
Count 1  Both defendants were charged with conspiracy to commit misconduct in office and bribery, in violation of N.J.S.A. 2A:85-1, N.J.S.A. 2A:93-6, N.J.S.A. 2A:98-1, N.J.S.A. 2A:98-2;
Count 2  Both defendants were charged with misconduct in office, in violation of N.J.S.A. 2A:85-1;
Count 3  Farinella was charged with bribery, in violation of N.J.S.A. 2A:93-6; and
In the remaining counts, Gola was charged with bribery, in violation of N.J.S.A. 2A:93-6.
At trial the State elected not to prosecute count 2 and at the conclusion of the trial both defendants were found guilty of counts 1, 3, 4, 5 and 6.
Defendant Farinella appeals.
A detailed factual recitation is necessary to an understanding of the issues raised here.
Farinella and Gola were Passaic County freeholders. This case concerns their alleged participation in a bribery scheme in connection with the county's purchase of a garage owned by Albert Scaletti.
Scaletti, a former mayor of Riverdale, was the State's chief witness and testified, pursuant to an "agreement" with the State, that he had owned property in Pompton Lakes, Passaic County, New Jersey, upon which there was *64 a large garage with offices attached, containing approximately 14,200 square feet. In October 1973 Gola, whom Scaletti had previously met, contacted him and inquired as to whether he would be interested in selling the garage to the county. Scaletti expressed interest and Gola indicated that further action would await the outcome of the November elections. No improper suggestions, demands or requests were made at this time.
Following the elections, which defendants won, Gola informed Scaletti that "he was going to get things in motion to buy the building" and that "they would buy it after the first of the year." Again no mention of any bribes or payments was made.
On January 8, 9 or 10, 1974 Scaletti led a number of the freeholders, including Farinella and Gola, on an inspection tour through the building. In the course of this tour Gola called Scaletti aside and stated, "Don wants three thousand dollars." Scaletti understood that Gola was referring to Farinella and replied, "I guess I'll have to give it to him." Sometime later during the tour Farinella approached Scaletti and asked him, "Did you have an understanding with Ed?" Scaletti answered, "Yes, you're to get three thousand dollars." Farinella responded, "That's right," and Scaletti then asked, "Who should I give this to, Ed?" Farinella replied, "No, give it to me." Scaletti had no further conversation with either Farinella or Gola that day. (Although Gola did not testify, Farinella did and, on this point, his testimony was essentially a denial that any such conversation occurred.)
A few days later Scaletti discussed these conversations with Gola. Gola stated, "Joe D'Arco [a freeholder] wants two thousand dollars." Scaletti stated, "I guess I'll have to give it to him." And Gola replied, "Fine."
On January 16 the freeholders passed a resolution authorizing City Counsel Verp, to negotiate with Scaletti for the purchase of the property. These negotiations led to a *65 contract of sale between the parties for $450,000 which was signed in early February 1974.
A $45,000 check drawn on the county's account, dated March 8, 1974, represented the first payment to Scaletti. Shortly after he deposited it Scaletti received a call from Farinella who said he wanted to see him. Scaletti went to Farinella's place of business, a wholesale Italian foods business in Passaic. When he arrived Farinella took him to a separate room where no one else was present. Farinella then said that he "wanted his money." Scaletti replied, "I don't have that money with me. I will go to the bank and get it."
Scaletti then drove to his bank, where he withdrew $5,000 from a safe deposit box. He placed $2,000 in an envelope which he later gave to his office manager to keep in his safe. He put the other $3,000 in his pocket and returned to Farinella's place at about 2 P.M. There he gave Farinella the $3,000.
When Farinella proceeded to count the money, Scaletti asked him if he was satisfied. Farinella replied, "Yes," and Scaletti then asked, "Now you don't expect any more," to which Farinella replied, "No."
A few days later Gola called Scaletti and arranged to meet him at the latter's office the following day. At this meeting Gola said that D'Arco wanted his money, the $2,000 previously mentioned. Scaletti got the $2,000 from his office safe and handed it to Gola.
Scaletti told Gola to count the money but Gola just put it in his pocket. Scaletti asked, "Now, what do you expect?" Gola replied that he wanted $5,000. Scaletti balked at the amount and then said, "Then you expect, between all you fellows, $10,000, is that right?" To that Gola said, "One fellow got $3,000 and the other fellow got two and he wanted five."
Scaletti's next conversation with Gola occurred on July 25, 1974 when they met in Scaletti's office in Pompton Lakes. Scaletti told Gola that he had $1,000 for him. He *66 gave him the money and again told him to count it. Again Gola did not do so and they had no further conversation on that day.
Title to the garage property changed in mid-October 1974, at which time Scaletti moved his business to Riverdale.
He next met Farinella in late October at a political dinner at which time Farinella told Scaletti that he'd heard about a letter which indicated that Scaletti was being investigated by the State. Scaletti told him, "There's nothing to it," and walked away.
In early January 1975 Scaletti and his attorney met with representatives of the Attorney General's office and ultimately entered into an agreement whereby his corporation, Albert Scaletti, Inc., would plead guilty to a charge against it and Scaletti would be given personal immunity for his part in both the so-called "Windbeam Property" deal (the same one to which the corporation pled) and the Pompton Lakes garage sale here involved. In return, Scaletti promised his truthful testimony.
Also in furtherance of the "arrangement" with the State, a recording device was set up on Scaletti's telephone by the State Police. On January 16, 1975 Scaletti contacted Gola by phone and arranged a meeting later that same day. Before this meeting, however, Scaletti was fitted with a concealed transmitting device and went unannounced to Farinella's place of business. Police and Deputy Attorneys General were stationed in a nearby car monitoring and recording the conversation which Scaletti had with Farinella inside the building.
The transcript of the recorded conversation indicates that Farinella suspected that Scaletti was taped and the transcript of this conversation contains little of significance.
As arranged, Gola came to Scaletti's office at approximately 4 P.M. The ensuing conversation lasted about 1-1/2 hours. It was monitored and recorded in the same fashion as the Farinella conversation. At the meeting Scaletti gave Gola $1,000 in bills which had been marked by the State. Upon leaving *67 Scaletti's office Gola was apprehended and a search revealed the marked bills.
The statements made by Gola at this meeting are clearly incriminatory both of himself and Farinella. Both the tapes and the transcriptions of these conversations were admitted into evidence over objection.
As indicated, Gola did not testify, nor did he produce any witnesses in his behalf.
[The court holds there was no error in (1) denying defendant's motion for severance of the defendants or, alternatively, of the county of the indictment, and (2) allowing the Scaletti-Gola and Scaletti-Farinella tapes in evidence.]
Defendant's third contention that the trial judge erred in "allowing the tapes to be admitted into evidence since the conspiracy had terminated and therefore Evid. R. 63(9) did not apply" is without merit.
It is clear that the jury could find that the conspiracy involved an agreement to make payments to Joe D'Arco Farinella and Gola. At the time the conversations were taped, payment of the $5,000 demanded by Gola had not been concluded. A conspiracy is presumed to have continued as to each member of it until either the object of the conspiracy has been established or there is proof of an affirmative act of withdrawal as to one or more members thereof. Wharton's Criminal law and Procedure (1957), § 92 at 202; see also Annotation, 4 A.L.R.3d 671, § 3 (1965). There is no suggestion of any act of withdrawal of Farinella from the conspiracy. The fact that he had been paid did not terminate the conspiracy, for Gola remained to be paid. This conspiracy not having been terminated when the conversations occurred, the tapes and transcripts thereof were properly admitted into evidence.
Defendant further contends it was error for the trial judge to permit the jury "to consider the taped conversations of Scaletti and Gola" in their deliberations as to the substantive crimes charged against defendant Farinella.
*68 The trial judge instructed the jury on this issue as follows:
[I]f you find based upon the proofs that a conspiracy, in fact, existed and that the defendants were among the co-conspirators, then any statement made by one defendant in furtherance of the conspiracy would be binding on the other defendant even though the other defendant was not present and, of course, if you find that such statement was, in fact, made.

* * * * * * * *
I further charge you that this rule will be binding in determining whether or not the defendants are guilty of any substantive offense, but only if you find that a conspiracy, in fact, did exist and both defendants were parties to that conspiracy and that the statement was made in furtherance of the object of the conspiracy.
Defendant charges that such instructions were erroneous, relying on the following passage from State v. Seaman, 114 N.J. Super. 19 (App. Div.), certif. den. 58 N.J. 594 (1971), cert. den. 404 U.S. 1015, 92 S.Ct. 674, 30 L.Ed.2d 662 (1972):
Finally, defendant claims that although the recordings might have been evidentially competent as to the conspiracy charge, they played no part in the misconduct and extortion charges and their use was therefore confusing to the jury and prejudicial. There is no basis to this claim. The trial judge in his charge specifically and clearly told the jury that the Broskie tapes could not be considered in relation to the other offenses (besides conspiracy). A similar argument was raised and rejected in State v. Dennis, 43 N.J. 418, 424 (1964). [114 N.J. Super. 19 at 28.]
Defendant seeks to draw the inference that the court there ruled that hearsay statements of one co-conspirator could not be used against another coconspirator in the deliberation of any charges other than that of conspiracy. We disagree. On the contrary, it there appeared that defendant conceded the relevance of the statements to the conspiracy count but challenged their relevance to the substantive offenses. Here, the taped conversations between Scaletti and Gola were clearly relevant to the substantive offenses charged. Moreover, defendant's contention is contrary to existing law on the subject. *69 In the case of State v. Louf, 64 N.J. 172 (1974), the Court noted:
This Court has held that where a conspiracy is shown to exist, the acts and declarations of any of the conspirators in furtherance of the common design may be given in evidence against any other conspirator. The rule is applicable where it is charged that a crime was committed in pursuance of a conspiracy, whether or not the indictment contains a count for such conspiracy. [at 176]
See also State v. Carbone, 10 N.J. 329, 338 (1952), and State v. Rios, 17 N.J. 572, 596 (1955).
If declarations made by co-conspirators in furtherance of the common design are admissible against all conspirators in those situations where the indictment does not charge conspiracy, then such declarations are clearly admissible to prove the commission of the substantive crimes where a conspiracy to commit the crime is charged. Evid. R. 63(9)(b)[1] does not provide that statements admitted pursuant to its terms are to be admitted for the limited purpose of proving the conspiracy.
We conclude that the judge did not err in permitting the jury, in its deliberations, to consider the taped conversations of Scaletti and Gola as to the substantive crimes charged against defendant Farinella.
Affirmed.
NOTES
[1] Evid. R. 63(9) provides:

A statement which would be admissible if made by the declarant at the hearing is admissible against a party if ... (b) at the time the statement was made the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan.